**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| COMENTIS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:09 CV 82  PPS |
| | ) | |
| PURDUE RESEARCH FOUNDATION, | ) | |
| ARUN K. GHOSH, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This case involves allegations that a Purdue University chemistry professor, Dr. Arun Ghosh, and the Purdue Research Foundation engaged in wholesale misconduct, including fraud, in how they handled certain trade secrets entrusted in the professor by CoMentis, Inc., a company to whom the professor provided consulting services.  CoMentis' sprawling complaint against Purdue and Ghosh asserts ten counts, including breach of written and oral contracts, promissory estoppel, trade secret misappropriation, fraud, constructive fraud, and unjust enrichment.  Presently before me is Purdue Research Foundation's Motion for Judgment on the Pleadings [DE 50], and Ghosh's Motion to Dismiss, or in the Alternative, Motion for a More Definite Statement [DE 53].  For the following reasons, Purdue's motion is **GRANTED** in part and **DENIED** in part, and Ghosh's motion is **GRANTED**, but CoMentis will be given an opportunity to file an amended complaint on some of the counts to attempt to cure the deficiencies in its complaint pointed out in this order.

## FACTUAL AND PROCEDURAL BACKGROUND

As usual, I'll start with the facts as alleged in the complaint, which I accept as true at this point in the case. CoMentis is a small biotechnology company focused on developing drugs to cure Alzheimer's disease. [DE 48 ¶ 6.] Arun Ghosh co-founded CoMentis's predecessor company, and he now serves as a paid consultant to CoMentis, helping it research and develop potential drug candidates. [*Id*. ¶¶ 7, 9.] Ghosh is also a scientist and chemistry professor at Purdue University. [*Id*. ¶ 8.] As an employee of Purdue, Ghosh must assign his right, title, and interest in any intellectual property he develops to Purdue or Defendant Purdue Research Foundation, a non-profit corporation that manages and licenses Purdue's intellectual property (for simplicity sake, I will refer to both Purdue and Purdue Research Foundation as "Purdue"). [*Id*.] As a result of Ghosh's obligations to Purdue, CoMentis entered separate written agreements with Ghosh and Purdue governing CoMentis's rights to Ghosh's work.

Ghosh and CoMentis's relationship is governed by a Consulting Agreement. Pursuant to the agreement, CoMentis pays Ghosh for advice regarding compounds and structures CoMentis is developing for potential drug candidates. [*Id*. ¶ 9.] In addition to providing advice, Ghosh may use CoMentis's confidential information to develop intellectual property of his own. [*Id*. ¶ 11.] But under the Consulting Agreement, if Ghosh develops intellectual property using CoMentis's confidential information, CoMentis has certain rights to the work, including the exclusive option to license the resulting intellectual property. [*Id*.] In addition, Ghosh must promptly notify CoMentis about any work he develops pursuant to the agreement and help CoMentis perfect its right, title, and interest in the intellectual property. [*Id*.] The agreement also states that Ghosh may not use or disclose CoMentis's confidential information, trade

secrets, inventions, or intellectual property except in performing his duties for CoMentis. [*Id.* ¶ 10.]

Purdue is not a signatory to the Consulting Agreement, however, CoMentis and Purdue entered into a License Agreement relating to the Consulting Agreement. [*Id.* ¶ 13.] The License Agreement grants CoMentis an exclusive license to Purdue's rights in patents and patent applications developed by Ghosh under the Consulting Agreement. [*Id.*] It also sets forth a list of "Licensed Patents" to which CoMentis has been granted an exclusive license under the agreement, and Purdue and CoMentis must update the list with any other patents or patent applications developed under the Consulting Agreement. [*Id.*] In essence, the Consulting Agreement and the License Agreement work together to ensure that CoMentis has the right to intellectual property that Ghosh develops using CoMentis's confidential information.

Pursuant to these agreements, CoMentis gave Ghosh confidential information and intellectual property relating to potential drug candidates, including compounds and structures from a class of compounds known as pyrrolidines. [*Id.* ¶ 14.] But "[i]n or about February 2009," CoMentis claims that Ghosh told CoMentis employee Geoff Bilcer that he had been performing his own work on these chemical compounds that were independent of his consulting work with CoMentis. [*Id.* ¶ 16.] In addition, Ghosh told CoMentis he had filed his own patent applications directed to these chemical compounds and structures. [*Id.*] Indeed, CoMentis subsequently learned about two patent applications – one filed in October 2008, the other in May 2009 – relating to pyrrolidine compounds both of which named Ghosh as the sole inventor. [*Id.* ¶ 17.] Not surprisingly, this raised eyebrows at CoMentis. For a period of time, CoMentis was unaware of what were in the patent applications because they were unavailable. But during that

time, both Ghosh and Purdue maintained that the patent applications were developed by Ghosh independent of the Consulting Agreement and outside the scope of the Consulting and License Agreements. [*Id*. ¶ 18.]

As a result, in May 2009, Purdue and CoMentis began negotiating a new license agreement that would cover the pyrrolidine patent applications. [*Id*. ¶ 20.] Purdue and CoMentis negotiated the terms of the license agreement from May to October 2009 and "eventually reached agreement on its material terms." [*Id*. ¶ 21.] On October 2, 2009, Purdue proposed that the parties enter a "Binding Letter of Intent" to memorialize the agreement. [*Id*. ¶ 22.] A few days later, the parties signed and executed a Binding Letter of Intent ("Binding LOI"), which stated: "for and in consideration of the mutual covenants and the premises herein contained, the Parties, intending to be legally bound, hereby agree . . . to make all reasonable efforts to execute no later than October 25, 2009, a license agreement which contains the material financial and economic terms set forth in, and is in a form substantially similar to, the draft pyrollidine [sic] license agreement," which was attached to the Binding LOI. [*Id*. ¶¶ 23-24.] But after extending the execution date to November 6, 2010, Purdue refused to execute the final license agreement. [*Id*. ¶¶ 26-29.] So, on November 13, 2009, CoMentis filed this suit against Purdue for breaching the Binding LOI. [*Id*. ¶ 29.]

While the parties haggled over the legal effect of the Binding LOI, an international patent application, which claimed "priority benefit to the two earlier pyrrolidine patent applications," became publicly available on April 15, 2010. [*Id*. ¶ 31.] Then on June 10, 2010, another international patent application filed by Purdue became publicly available. [*Id*. ¶ 32.] According to CoMentis, these applications were derived from confidential information that

CoMentis disclosed in confidence to Ghosh under the Consulting Agreement. [*Id.* ¶ 33.] CoMentis claims it did not know the contents of these patent applications – or that they were derived from CoMentis's confidential information – until they become publicly available. [*Id.* ¶¶ 19, 30.]

As a result, on July 13, 2010, CoMentis filed the Second Amended Complaint against Purdue and Ghosh asserting ten separate counts, including: declaratory relief against Purdue (Count One); breach of contract against Ghosh (Count Two); breach of contract against Purdue (Count Three); breach of an oral contract or, alternatively, breach of an implied in fact contract against Purdue (Count Four); promissory estoppel against Purdue (Count Five); trade secret misappropriation against Purdue and Ghosh (Count Six); fraud against Ghosh (Count Seven); constructive fraud against Ghosh (Count Eight); unjust enrichment against Purdue (Count Nine); and breach of the Binding LOI against Purdue (Count Ten). In these motions, Purdue moves for judgment on the pleadings under Fed. R. Civ. P. 12(c) with respect to Count Four (and Count One as it relates to Count Four), Count Five, Count Six, Count Nine, and Count Ten, and Ghosh moves to dismiss Counts Seven and Eight under Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

A motion for judgment on the pleadings under Rule 12(c) is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss. *See Guise v. BWM Mortgage, Inc.*, 377 F.3d 795, 798 (7th Cir. 2004). The only difference between the motions is that a party can move for judgment on the pleadings after both the complaint and the answer are filed. *See* Fed. R. Civ. P. 12(c). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that it plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct.

1937, 1949 (2009).  Determining whether a complaint states a plausible claim for relief requires me to draw on my judicial experience and common sense.  *Id.* at 1950.  And although at this stage I must accept all allegations as true and draw all reasonable inferences in the complainant's favor, I don't need to accept threadbare legal conclusions supported by mere conclusory statements.  *Id.*

## I.    Purdue's Motion for Judgment on the Pleadings

## A.    Breach of Contract (Count Four) and Promissory Estoppel (Count Five)

Purdue moves for dismissal of Counts Four and Five of the Second Amended Complaint.  In Count Four, CoMentis alleges that Purdue breached the parties' oral, or alternatively, implied in fact contract, by (among other things) "failing to perform the obligations set forth in the Consulting Agreement" and by failing to grant CoMentis a license under the Consulting and License Agreements.  [DE 48 ¶ 55.]  Alternatively, Count Five asserts that Purdue failed to perform its Consulting Agreement obligations under a promissory estoppel theory.  [*Id.* ¶ 58.]  Purdue moves to dismiss these claims because they address the same subject matter as Count Three, which alleges that Purdue breached the parties' express contract – the License Agreement.  (Recall that Purdue is not a signatory to the Consulting Agreement.)

Express and implied in fact contracts are traditional contracts.  *Zoeller v. East Chicago Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009).  The only difference between the two is that an express contract is evidenced by spoken or written words while an implied contract is evidenced by the parties' conduct.  *Ahuja v. Lynco Ltd. Med. Research*, 675 N.E.2d 704, 709 (Ind. App. 1996).  By contrast, promissory estoppel is a noncontractual remedy.  It "makes a promise that induces reasonable reliance legally enforceable" in the absence of consideration.  *Garwood Packaging, Inc. v. Allen & Co, Inc.*, 378 F.3d 698, 701-02 (7th Cir. 2004).  As a

general matter, a party may plead breach of an express contract, breach of an implied contract, and promissory estoppel in the alternative, even though the claims are inconsistent. *See* Fed. R. Civ. P. 8(d).

With that said, a claim for breach of an implied contract may not proceed in the alternative where the parties have an express contract that covers the same subject matter. *McCart v. Chief Executive Officer*, 652 N.E.2d 80, 85 (Ind. App. 1995). But Indiana courts apply this rule narrowly to preclude an implied contract claim only where "an express contract exists that covers *identical* subject matter." *ViaStar Energy, LLC v. Motorola, Inc.*, 2006 WL 3197449, at *2 (S.D. Ind. June 16, 2006) (emphasis in original); *see e.g., Engelbrecht v. Property Developers, Inc.*, 296 N.E.2d 798, 801 (Ind. App. 1972) ("An implied contract cannot exist where an express contract covers the identical subject matter.").

Similarly, a claim of promissory estoppel will permit recovery only where no contract in fact exists. *Indiana Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. App. 2008) (internal quotations omitted). Indeed, "if the promises . . . are founded on a valid written contract between the parties, then the promissory estoppel claim becomes unwarranted surplusage." *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 848-49 (S.D. Ind. 2005) (citing *Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 932 (Ind. App. 2003)).

The issue thus becomes whether CoMentis's breach of contract and promissory estoppel claims in Counts Four and Five cover the same subject matter as its breach of contract claim in Count Three. Purdue argues that Counts Four and Five are just alternative ways of arguing that Purdue is bound to perform the License Agreement, which "is the sole source of any license to CoMentis and Purdue's alleged contract obligation." [DE 64 at 6.] So, the argument goes,

because the presence of the License Agreement is undisputed, and Counts Four and Five seek relief through the License Agreement, CoMentis plead away these claims. But CoMentis counters that the issue in Counts Four and Five is whether Purdue breached the *Consulting Agreement*, not the License Agreement. According to CoMentis, because Purdue is not a signatory to the Consulting Agreement, it may plead these counts in the alternative.

I agree with CoMentis – Counts Four and Five do not address the same subject matter as Count Three. In Count Three, CoMentis claims that Purdue breached the License Agreement by refusing to add the pyrrolidine patent applications to the list of License Patents pursuant to the agreement. As Purdue notes, Purdue and CoMentis are undisputably bound by the License Agreement. But Counts Four and Five assert, among other things, that Purdue breached the parties' contract (or alternatively, promise) by "failing to perform the obligations set forth in the Consulting Agreement," [DE 48 ¶¶ 55, 58], to which Purdue was not a signatory.

This matters because the Consulting and License Agreements differ in key respects. The Consulting Agreement determines whether a license should be granted and lays out the parties' obligations in making that determination; if those obligations are met, and CoMentis exercises its right to the license, the License Agreement kicks in. In short, the License Agreement has no effect until the parties perform their respective obligations under the Consulting Agreement.

Indeed, the Consulting Agreement contains obligations that are independent of the License Agreement. Oddly, despite the fact that Purdue is not a signatory, the Consulting Agreement lays out specific disclosure and notification requirements Purdue must meet that are completely absent from the License Agreement. For example, the Consulting Agreement states that "Purdue will promptly furnish [CoMentis] with disclosure" of any intellectual property

developed under the Consulting Agreement.   [DE 54-1 ¶ 3.2 (Consulting Agreement).][1]  Also,

Purdue must allow CoMentis to prosecute any patent applications arising under the Consulting

Agreement.  [*Id.*]  As a result, the Consulting Agreement and the License Agreement govern

different obligations, and thus, different subject matter.

Purdue's arguments to the contrary are unpersuasive.  First, Purdue makes much of the

fact that CoMentis explicitly alleges that the contract at issue in Counts Four is "subject to the

terms of the Consulting Agreement *and* License Agreement."  [DE 51 at 12 (Purdue MJP)

(emphasis added); 48 ¶¶ 53, 55 (Second Amended Complaint).]  So, what?  While clearly there

is some overlap between the Consulting Agreement and the License Agreement – both involve

CoMentis's rights to work developed by Ghosh using CoMentis's information – this does not

change the fact that the Consulting Agreement lays out specific obligations and requirements not

contained in the License Agreement.  As for Purdue's claim that the License Agreement is the

sole source of CoMentis's relief, this is false.  The Consulting Agreement itself states that

"Purdue grants [CoMentis] the option" to an exclusive license to Ghosh's work developed under

the agreement.  [DE 54-1 ¶ 3.5.]  So by alleging that Purdue is bound by – and breached – these

requirements, Counts Four and Five state an actionable claim under the Consulting Agreement.

As a result, Counts Four and Five survive.

**B.     Trade Secret Misappropriation (Count Six)**

Purdue next argues that CoMentis plead away its trade secret misappropriation claim in

Count Six.  Trade secret misappropriation is governed by Indiana's Uniform Trade Secret Act

---

[1]  Purdue incorporates the Consulting Agreement in its answer, and it is thus part of the
pleadings.  [*See* DE 49 ¶ 9.]

("IUTSA"). Ind. Code § 24-2-3-1 *et seq.* A "trade secret" is information that: "(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ind. Code § 24-2-3-2. "Misappropriation" is defined, in relevant part, as disclosure or use of a trade secret without consent by one who knew or had reason to know the trade secret was "acquired under circumstances giving rise to a duty to maintain secrecy or limit its use" or derived from one who "owed a duty to the person seeking relief to maintain its secrecy or limit its use." Ind. Code § 24-2-3-2(2)(B)(ii)-(iii).

According to CoMentis, the confidential information and intellectual property it revealed to Ghosh constituted trade secrets, and Purdue and Ghosh misappropriated these secrets by improperly publishing them in patent applications without CoMentis's consent. But Purdue claims that CoMentis plead away both the "trade secret" and "misappropriation" elements. Purdue argues that by voluntarily disclosing its confidential information and intending Ghosh's research to end up in Purdue owned-patent applications, CoMentis essentially waived any trade secret status. In the same vein, Purdue argues that CoMentis plead away the misappropriation element by admitting that Purdue is the rightful owner of the intellectual property that CoMentis gave to Ghosh. Purdue claims it cannot be liable for misappropriating its own information.

Both of Purdue's arguments fail. First, CoMentis took reasonable steps to maintain the secrecy of its confidential information by giving its information to Ghosh subject to a non-

disclosure and confidentiality provision in the Consulting Agreement.[2]  This provision only

permitted Ghosh to use CoMentis's confidential information and intellectual property in the

course of his duties for CoMentis and prohibited Ghosh from disclosing the information to

others.  *See Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp.*, 759 N.E.2d 239, 246 (Ind. App.

2001) (citing confidentiality provisions as an adequate means of protecting trade secrets).

     Nonetheless, Purdue claims that CoMentis waived trade secret status by disclosing its

confidential information to Ghosh knowing that it would end up in a Purdue-owned patent

application.  Not so.  Purdue confuses CoMentis's trade secrets with Ghosh's inventions.  The

complaint states that Ghosh "is required to assign his right, title, and interest in any intellectual

property *he develops*" to Purdue.  [DE 48 ¶¶ 8, 13 (emphasis added).]  So until the secrets are

"developed" into inventions by Ghosh, the confidential information that CoMentis gives to

Ghosh falls outside of the parties' agreements.  And in fact, according to Ghosh at oral argument,

much of the work Ghosh performed for CoMentis never ended up in a patent applications, but

instead involved Ghosh advising CoMentis on drugs it was developing.  In other words, Ghosh's

consulting work did not necessarily produce an invention under the parties' agreements.  So just

because CoMentis gave its information to Ghosh did not mean that it intended the information to

end up in a Purdue-owned patent application or that CoMentis assigned its trade secrets to Ghosh

or Purdue.

     But more importantly, CoMentis does not allege that by seeking Ghosh's advice it

transferred ownership of its trade secrets to Purdue to do with as it pleased.  If this were true,

---

     [2]   Purdue does not allege that CoMentis's confidential information fails to meet the
other elements of a "trade secret" under the IUTSA.

CoMentis would be essentially publishing its inventions every time it sought Ghosh's advice – this belies the complaint and common sense. Moreover, this argument ignores the contractual duties laid out in the parties' agreements. Indeed, granting CoMentis all reasonable inferences, CoMentis disclosed its information to Ghosh subject to specific terms and for a specific purpose – so Ghosh could provide advice and create patents for the benefit of CoMentis – and, according to CoMentis, Purdue failed to perform its end of the deal. So by ensuring that its confidential information would only be used and disclosed pursuant to the rights and obligations set forth in the Consulting and License Agreements, CoMentis took reasonable steps to maintain the secrecy of its confidential information. *See King-Indiana Forge, Inc. v. Millenium Forge, Inc.*, 2009 WL 734720 (S.D. Ind. Mar. 18, 2009) (breach of contract and misappropriation claims may arise from the same conduct); Ind. Code § 24-2-3-1(c).

Similarly, by claiming that Purdue improperly used and disclosed its trade secrets, CoMentis adequately alleged misappropriation. CoMentis alleges that Purdue misappropriated its trade secrets by improperly using the information without CoMentis's consent. Again, CoMentis allowed Ghosh to use its trade secrets in patent applications with the understanding that the information would be used for a particular purpose – to create patents that will then be licensed back to CoMentis. Although Ghosh was permitted to use CoMentis's secrets to invent patents, if he developed a patent application, Ghosh and Purdue then had a duty to "maintain [the] secrecy or limit [the] use" of CoMentis's secrets pursuant to the parties' agreement. Ind. Code § 24-2-3-2(2)(B)(ii)-(iii). By alleging that Purdue ignored these obligations, CoMentis has stated a claim for trade secret misappropriation. *See, e.g., Morris Silverman Mgmt. Corp. v. Western Union Fin. Servs., Inc.*, 284 F. Supp. 2d 964, 992-93 (N.D.Ill. 2003) ("Where the parties

have a contractual relationship that defines the duty of nondisclosure, the contract defines that duty for purposes of misappropriation under ITSA.")[3]; *EarthDweller, LTD v. Rothnagel*, 1993 WL 487546, at *7 (N.D. Ill. Nov. 22, 1993) (same).

## C. Unjust Enrichment (Count Nine)

Purdue also seeks to dismiss CoMentis's unjust enrichment claim in Count Nine. Unjust enrichment is an equitable remedy that permits a recovery, even in the absence of a contract, where justice demands it. *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991). But where an express contract governs the parties' behavior, a claim for unjust enrichment is not cognizable. *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 168 (Ind. App. 2004); *DiMizio v. Romo*, 756 N.E.2d 1018, 1025 (Ind. App. 2001) ("Unjust enrichment operates when there is no governing contract."). Nonetheless, plaintiffs seeking recovery for breach of contract often plead unjust enrichment in the alternative, "because this theory allows for the possibility of recovery even if the court finds that no contract existed or that a contract existed but was unenforceable." *Blue Frog Mobile NV, Inc. v. Navicomm LLC*, 2007 WL 3334793, at *3 (S.D. Ind. Nov. 8, 2007).

Here, similar to Counts Four and Five, Purdue seeks to dismiss CoMentis's unjust enrichment claim in Count Nine because it covers the same subject matter as the parties' express contract, the License Agreement. The parties are unquestionably bound by an enforceable express contract governing the parties' relationship – the License Agreement – which CoMentis claims Purdue breached in Count Three. So, again, the issue is whether the unjust enrichment

---

[3] Both the Illinois Trade Secrets Act ("ITSA") and the IUTSA are modeled after the Uniform Trade Secrets Act ("UTSA"), and Indiana courts seek guidance from states that model their trade secret statutes after the UTSA. *AGS Capital Corp., Inc. v. Prod. Action Int'l, LLC*, 884 N.E.2d 294, 306-07 (Ind. App. 2008).

claim covers the same subject matter as the License Agreement. I find that it does.

The License Agreement "granted CoMentis an exclusive license to PRF's and Purdue's rights in patents and patent applications directed to inventions developed under the Consulting Agreement." [DE 48 ¶ 13.] And, in Count Three, CoMentis claims Purdue breached the License Agreement by failing to add the pyrrolidine patent applications to the Licensed Patent list despite the fact that Ghosh relied on CoMentis's information in developing the applications. Then, in Count Nine, CoMentis claims that Purdue "wrongfully retained the benefits of CoMentis's confidential information . . . [by] incorporating CoMentis's confidential information and trade secrets into the [pyrrolidine patent applications], and purporting to take exclusive rights in the [pyrrolidine patent applications] without any compensation to CoMentis." [*Id.* ¶ 85.]

These counts are one and the same. The License Agreement grants CoMentis the rights to an "exclusive license" on any patent applications developed by Ghosh using CoMentis's confidential information. And CoMentis claims Purdue was unjustly enriched because it took the "exclusive rights" to patent applications developed by Ghosh using CoMentis's confidential information without paying CoMentis its due. The "exclusive license" that CoMentis claims it is owed under the License Agreement is the same "exclusive rights" that have unjustly enriched Purdue. In essence, CoMentis's unjust enrichment claim seeks money damages (rather than an exclusive license) because Purdue failed to add the patent applications to the Licensed Patents list, as the License Agreement requires. In either case, the License Agreement controls CoMentis's rights to relief from Purdue. As a result, unlike Counts Four and Five, in which CoMentis claims that Purdue was bound by the Consulting Agreement to which it was not a signatory, in Count Nine, CoMentis claims that Purdue was unjustly enriched for not performing

its obligations under the parties' express contract.

And CoMentis seems to acknowledge this fact. It argues that "[i]f the [pyrrolidine patent applications] are found to be encompassed by the License Agreement, CoMentis's rights with respect to those obligations will be governed by the License Agreement." [*See* DE 60 at 17 (CoMentis Response Brief).] But CoMentis claims that if the patent applications are not found to be Licensed Patents under the License Agreement, it should be able to pursue its unjust enrichment claim in the alternative. [*Id*.] In other words, while CoMentis admits that the License Agreement (along with the Consulting Agreement) governs its right to license the patent applications, CoMentis argues that if its breach of contract claim fails, it should be able to plead unjust enrichment in the alternative.

To plead in the alternative, a plaintiff must claim *both* that a contract was breached and that a contract did not exist but equity demands that the injury be compensated. *See F. McConnell and Sons, Inc. v. Target Data Systems, Inc.*, 84 F. Supp. 2d 961, 977 n.19 (N.D. Ind. 1999). A party cannot pursue equitable relief simply because its contract claim fails, without alternatively alleging that there was either no contract on point or the contract at issue was unenforceable. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) ("Once a valid contract is found to exist, quasi-contractual relief is no longer available."); *SMC Corp. v. Peoplesoft USA, Inc.*, 2004 WL 2538641, at *3 (S.D. Ind. Oct. 12, 2004); (dismissing complaint with prejudice because it "does not allege that the contract is void or otherwise unenforceable"); *see e.g., The Sharrow Group v. Zausa Dev. Corp.*, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004) ("Plaintiff maintains that it is only seeking relief under [unjust enrichment] to the extent it does not recover for breach of contract. This is irrelevant, for

it is not the availability of relief that determines whether plaintiff may pursue th[is] action[], but the existence of an express contract.").

Despite clear authority to the contrary, this is precisely what CoMentis is attempting to do here. It argues, on the one hand, that if its breach of contract claim in Count Three prevails, the License Agreement governs. But it asserts on the other hand that if its breach of contract claim fails, it should be able to argue unjust enrichment without alternatively arguing that the License Agreement is either void or unenforceable. This is improper – CoMentis may not seek unjust enrichment *just in case* the contract does not afford it the relief it seeks; a valid contract still governs the parties' rights with respect to the subject matter at issue. *See e.g., The Sharrow Group*, 2004 WL 2806193, at *3. In fact, if CoMentis's breach of contract argument fails, and CoMentis has no rights to the patent applications under the License Agreement, how was Purdue unjustly enriched? In sum, by admitting that the License Agreement controls the dispute, CoMentis's unjust enrichment count may not proceed. *See Hoosier Energy Rural Elec. Co-op., Inc. v. Amoco Tax Leasing IV Corp.*, 1992 WL 684355, at *2-3, 10 n.5 (S.D. Ind. Mar. 17, 1992) (dismissal proper where the "Plaintiff acknowledges that a written contract covers the subject matter of this dispute."). Count Nine is dismissed with prejudice.

**D.      Breach of Contract for Failing to Execute the "Binding Letter of Intent" (Count Ten)**

Purdue's final attack on the complaint is directed at Count Ten. In that Count, CoMentis claims that Purdue breached the parties' Binding LOI. Briefly, here is a refresher on the facts giving rise to this issue: in October 2008 and May 2009, CoMentis learned that Purdue had filed patent applications for work performed by Ghosh that involved a class of compounds known as

pyrrolidines. Ghosh claimed the work was similar, but independent of his work for CoMentis. If this was true, the patent applications fell outside of the parties' Consulting and License Agreements, and CoMentis had no rights to the patent applications. From May to October 2009, CoMentis and Purdue negotiated for a new license agreement that would cover these new patent applications. By October 6, 2009, the parties had "reached an agreement on all material terms" for a new license agreement, and they signed the "Binding Letter of Intent" to "memorialize the agreement." [DE 48 ¶¶ 21-23.] The "legally binding" letter of intent required that "[t]he Parties agree to make all reasonable efforts to execute no later than October 25, 2009, a license agreement which contains the material financial and economic terms set forth in, and is in a form substantially similar to, the draft pyrollidine [sic] license agreement attached" to the Binding LOI. [*Id.* ¶ 24.] But the date to execute the final agreement came and went, and Purdue refused to sign. So CoMentis considered Purdue in breach of the Binding LOI and initiated this action for breach of contract.

CoMentis claims that Purdue "breached the terms of the contract by, among other things, refusing to execute the license agreement and failing to make all reasonable efforts to execute the license agreement." [*Id.* ¶ 93.] But according to Purdue, the complaint fails to allege that the letter of intent was an exchange of an offer and acceptance. Instead, Purdue claims the Binding LOI was a mere agreement to agree, and because a "binding" agreement to make "reasonable efforts" to agree is illusory, CoMentis plead away any notion that the draft was a contract.

It is true that, under Indiana law, an agreement to agree is unenforceable. *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996). "An agreement to agree is one in which the parties intend to be 'bound only after executing a subsequent written document.'" *UFG, LLC v.*

*Southwest Corp.*, 784 N.E.2d 536, 545 n.7 (Ind. App. 2003) (quoting *Wolvos*, 668 N.E.2d at

675). "Nevertheless, parties may make an enforceable contract which obligates them to execute

a subsequent final written agreement." *Wolvos*, 668 N.E.2d at 674; *see also UFG*, 784 N.E.3d at

544 ("[T]he mere reference to the making of a future formalized document does not necessarily

void an otherwise unambiguous existing agreement as a whole."). In such a case, the final

agreement is simply a memorial of the agreement already reached. *Wolvos*, 668 N.E.2d at 674-

75. The distinction is admittedly a bit slippery. In determining which side of the hazy line any

particular agreement falls – Is it an enforceable contract or merely an agreement to agree? –

courts look to the parties' intent to be bound and the definiteness of terms. *Id*. at 675.

CoMentis has sufficiently alleged that the Binding LOI is a binding contract obligating

the parties to the material terms to which the parties agreed rather than a mere agreement to

agree. First, CoMentis alleges that the parties negotiated for over six months, exchanging

numerous drafts, before finally "reach[ing] agreement on all material terms." [DE 48 ¶ 21.] And

then Purdue proposed that the parties enter into a *binding* letter of intent "to memorialize this

agreement." [*Id*. ¶ 22 (emphasis added).] The resulting Binding LOI, to which the parties

intended "to be legally bound," laid out a three-week time line for executing a final agreement

that would contain the same "material financial and economic terms set forth in, and is in a form

substantially similar to" a draft agreement attached to the Binding LOI. [*Id*. ¶¶ 23-24.] Based on

these allegations, the complaint alleges that the parties intended to be bound by the definite

financial and economic terms set forth in the draft agreement. *See Wolvos*, 668 N.E.2d at 674-

75.[4]

Yet Purdue argues that CoMentis fails to allege an offer and acceptance sufficient to bind the parties to the "draft" license agreement. But, again, CoMentis specifically asserted that, following months of negotiations, the parties agreed to legally bind themselves to the material terms set forth in the draft agreement. This is enough to allege contract formation. *See Paris v. Faith Properties, Inc.*, 2009 WL 4799736, at *6 (N.D. Ind. Dec. 8, 2009) (under Indiana law, the plaintiff must plead "the existence of a contract" to state a claim for breach of contract). And while it appears the parties believed there were issues yet to be resolved, it is consistent with the complaint – and certainly plausible – that the non-material issues that the parties left for another day were procedural – merely dotting i's and crossing t's. Why else would the parties give themselves just three weeks to "execute" the final agreement, despite negotiating the terms of the license agreement for over six months? The heavy lifting, it seems, had already been done. Moreover, while labeling the agreement a "draft" may create ambiguity as to whether the parties intended to form a contract, the parties' intent is not at issue on a motion to dismiss.

Next, citing the axiom that a party may prescribe the mode of acceptance, Purdue claims that CoMentis "admits that contract formation would only occur if/when both parties signed a final license contract document." [DE 51 at 18-19]; *citing Rockwood Mfg. Corp. v. Amp, Inc.*, 806 F.2d 142, 145 (7th Cir. 1986) ("Under Indiana law, an offeror is master of his offer, and as such he may prescribe the mode in which an acceptance must be made."). CoMentis did no such thing. In fact, the "execution" that Purdue cites as showing that the parties' prescribed the mode

---

[4] Purdue's unsupported argument that *Wolvos* only applies only to option contracts is incorrect. *See Mays v. Trump Indiana, Inc.*, 255 F.3d 351, 357-58 (7th 2001); *McLinden v. Coco*, 765 N.E.2d 606, 612 (Ind. App. 2002).

of acceptance – requiring the signature of both parties on the final license agreement – is the same "execution" that CoMentis claims did nothing more than merely formalize their earlier agreement. Granting CoMentis all reasonable inferences, this is not enough to show that the parties failed to comply with a prescribed manner of acceptance.

Finally, Purdue argues that the Binding LOI is not enforceable because CoMentis alleges that Ghosh fraudulently induced CoMentis to enter the agreement. This is a curious argument. A contract induced by fraud is not void; it's merely voidable. *Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 283 (Ind. 1983). If the party that was fraudulently induced to enter an agreement wants to stick to the contract, the offending party is likewise bound. *Prudential Ins. Co. of America v. Smith*, 108 N.E.2d 61, 64 n.3 (Ind. 1952). Moreover, CoMentis may plead both breach of contract and fraud in inducing that same contract in the alternative, it just can't recover under both theories. *See* Fed. R. Civ. P. 8(d); *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371 (7th Cir. 1990) (rejecting the argument that a party must "sue either for breach of the contract or to disaffirm the contract as having been induced by fraud" based on Rule 8's alternative pleading standard). As a result, the alleged misrepresentations made by Ghosh are irrelevant at this stage in the proceedings. Count Ten survives.

## II.     Ghosh's Motion to Dismiss, or Alternatively, Motion for a More Definite Statement

I move now to Ghosh's motion. He seeks dismissal (or a more definite statement) on the fraud count (Count Seven) and the constructive fraud count (Count Eight).

## A.     Fraud (Count Seven)

CoMentis claims in Count Seven that Ghosh committed fraud by falsely representing that the pyrrolidine patent applications he filed were developed outside the scope of the Consulting

and License Agreements.  Specifically, the complaint alleges:

> In or about February 2009, Dr. Ghosh represented to Geoff Bilcer, CoMentis's Senior Director of Medicinal Chemistry, that he had been performing his own work on chemical compounds and structures similar to those on which CoMentis had sought his advice pursuant to the Consulting Agreement, and that he had filed his own patent applications directed to those chemical compounds and structures. Dr. Ghosh claimed that this work was done outside of and independent from his consulting work for CoMentis.

[DE 48 ¶ 16.]  CoMentis claims that Ghosh knew these statements were false (or else he made them recklessly), and he intended CoMentis to rely on the representations, which it did.  [*Id.* ¶¶ 70-74.]

Ghosh attacks this claim on three fronts.  First, he argues that the fraud claim impermissibly rests on Ghosh's opinions rather than misrepresentations of fact.  Next, he asserts that the fraud allegation is just a repackaged breach of contract claim.  Finally, Ghosh claims that CoMentis fails to allege fraud with the necessary particularity.  I address these arguments in turn.

**1.      CoMentis's Fraud Allegation Rests on Misrepresentations of Fact, Not Opinions**

Ghosh argues that CoMentis failed to allege fraud because the claim is based on Ghosh's opinions rather than misrepresentations of fact.  The argument goes that Ghosh's opinion that the patent applications were similar but independent of his work under the Consulting Agreement, is just that – an opinion – and not a misstatement of fact for fraud purposes.  Ghosh also claims that CoMentis should not have relied on these statements in any event because, as a sophisticated drug company, it was unreasonable to rely on Ghosh's opinions on these legal issues. The statements about who invented the patent applications are difficult questions of patent law, not questions of fact, according to Ghosh.

I disagree – Ghosh's alleged statements are misrepresentations of fact.  It is true that

"[m]ere expressions of opinion cannot be the basis for an action in fraud; an action in fraud requires a misrepresentation of material fact." *Block v. Lake Mortg. Co., Inc.*, 601 N.E.2d 449, 451 (Ind. App. 1992). Nonetheless, "the general rule in Indiana is that if a statement is 'susceptible of exact knowledge' when made, it is a statement of fact rather than opinion." *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, 2009 WL 449173, at *3 (N.D. Ind. Feb. 23, 2009) (quoting *Smart & Perry Ford Sales, Inc. v. Weaver*, 274 N.E.2d 718, 721 (Ind. App. 1971)); *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986) ("An opinion is a subjective statement of belief 'on which no reasonable [person] should justifiably rely.'") (quoting *Whiteco Properties, Inc. v. Thielbar*, 467 N.E.2d 433, 437 (Ind. App. 1984)). Whether a representation is an expression of opinion or a statement of fact depends on the facts and circumstances of the case. *Plymale v. Upright*, 419 N.E.2d 756, 763 (Ind. App. 1981).

Accepting the allegations in the complaint as true, Ghosh told CoMentis that he did not rely on certain information in developing the patent applications when in reality, he did. This is susceptible of exact knowledge – either Ghosh did or did not use CoMentis's confidential information in creating the patent applications. He need not have made a legal determination regarding inventorship, and he needed no special training to know if he relied on CoMentis's confidential information in creating the patent applications. And CoMentis reasonably relied on Ghosh's statements; according to CoMentis, it had no way of determining the accuracy of Ghosh's representations until the patent applications became public. Moreover, even if the statements were just opinions, CoMentis claims that Ghosh made the representations dishonestly or recklessly. *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 848 (Ind. App. 1990) ("[I]f [the defendant] was merely stating his opinion, his failure to ascertain the truth of his statements

was reckless, and an action for actual fraud may be based on reckless misrepresentation."). At the very least, this determination should be made with a full record.

## 2.    CoMentis's Fraud Claim is Distinct from its Breach of Contract Claim

Ghosh next argues that CoMentis's fraud claim fails because it is simply a repackaged version of its breach of contract claim. Under Indiana law, "a claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach." *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. App. 2004). Because CoMentis adequately alleges that Ghosh falsely represented that his work was independent of the Consulting Agreement, and CoMentis reasonably relied on the representation to its detriment, CoMentis's actual fraud claim would proceed absent any contractual relationship between the parties. *See Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 667 (Ind. App. 2002) (laying out the elements of actual fraud). So the issue is whether CoMentis's fraud claim alleges an *injury* that is distinct from the injury set forth in its breach of contract claim against Ghosh.

CoMentis cites three harms that occurred as a result of Ghosh's misrepresentations that are distinct from CoMentis's contract remedies. First, CoMentis claims that because of Ghosh's misrepresentations, it was "lulled into unwittingly allowing its confidential information to be used and published by Dr. Ghosh and [Purdue] without its consent." [DE 62 at 18.] But, at the same time, CoMentis claims that its "*breach of contract theory* rests on, *inter alia*, Dr. Ghosh's unconsented disclosure of CoMentis's trade secrets and other confidential information . . . and the subsequent use of and disclosure of CoMentis's confidential information in the [pyrrolidine patent applications]." [*Id*. at 17 (emphasis added).] So CoMentis admits that if Ghosh

improperly used and disclosed CoMentis's confidential information without its consent, his actions violated the parties' agreement. Thus, any resulting injury is not distinct from that claim.

CoMentis also asserts that Ghosh's misrepresentations lulled it into "continuing the consulting arrangement with Dr. Ghosh." [*Id*. at 18.] But CoMentis fails to state how it was injured by continuing under this arrangement (outside of the breach of contract, of course). Indeed, nothing in the complaint suggests that CoMentis would not have continued under the parties' agreement absent Ghosh's misrepresentations.

Finally, CoMentis claims it was harmed because it "enter[ed] into unnecessary licensing negotiations with [Purdue] rather than insisting on its rights under the existing License Agreement." [*Id*.] Recall that if Ghosh told CoMentis the truth about his work – *i.e.*, that he actually did use CoMentis's information in creating the patent applications at issue (assuming the facts pled are true) – CoMentis would have had the rights to an exclusive license to the patents. On the other hand, if Ghosh had remained silent about his work, CoMentis would not have learned the truth about the patents until they became public in April and June 2010, at which point CoMentis could have filed a breach of contract action (which it did). But, according to CoMentis, because Ghosh affirmatively lied about the independence of the work, it mistakenly believed that Ghosh created patent applications that were "similar but independent" from his consulting duties. So, believing that it had no exclusive right to license the applications, CoMentis spent the next six months negotiating a new license agreement with Purdue, which eventually lead to the Binding LOI. But the parties never performed under the Binding LOI, so CoMentis's injuries stemming from the misrepresentation are the transaction costs CoMentis

incurred negotiating the new license agreement.[5]

At least one Indiana court has found these types of "transaction costs" sufficient to create an injury independent from the breach of contract. *See America's Directories Inc., Inc. ("ADI") v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1067-68 (Ind. App. 2005). In *American Directories*, a salesperson from ADI induced the owner of One Hour Photo, Paul Saalfield, to buy advertising space in a magazine by telling Saalfield, among other things, that he could cancel the contracts at any time. *Id*. at 1064. But over the next two years, ADI repeatedly ignored Saalfield's attempts to cancel the contracts and continued to charge One Hour for subsequent advertisements. *Id*. at 1064-65. As a result, One Hour claimed that ADI both breached the parties' contracts by not allowing One Hour to cancel the contracts and fraudulently induced One Hour to enter the contracts, and a jury awarded One Hour compensatory and punitive damages. *Id*. at 1065. On appeal, ADI argued that One Hour's fraud claim was a repackaged breach of contract claim, and so the jury improperly awarded punitive damages. *Id*. at 1067. But the appellate court disagreed, finding the fraud independent of the breach of contract claim. In particular, the court found the fraud injury distinct from the breach of contract injury because "Saalfield spent many hours faxing, calling, and writing ADI in an effort to cancel the contracts, while still believing that ADI's failure to cancel was merely an oversight." *Id*. at 1068.

This case is similar. CoMentis claims that Ghosh's fraudulent misrepresentations induced it to enter a new license agreement with Purdue on less favorable terms. As a result,

---

[5] Though it is not entirely clear why Ghosh would lie about his work if his intent was to hide the patent applications, it is plausible that Ghosh intended to induce CoMentis to enter a new license agreement on less favorable terms.

CoMentis spent six months negotiating a new license agreement, incurring costs it would not have suffered but for Ghosh's misrepresentations. It is true that in *American Directories*, the injured party spent resources attempting to *get out* of the fraudulently induced contract, whereas here CoMentis spent resources negotiating a new agreement with Purdue after being fraudulently induced to do so. But this is a distinction without a difference. In both cases the injured parties incurred unnecessary expenses as a result of the offending parties' misrepresentations at a time when the injured parties did not know the misrepresentations were false.

Ghosh argued at oral argument that these costs are recoverable by CoMentis through its breach of contract claim. It's too difficult to determine this on the pleadings. Under Indiana law, tort damages are any injuries "directly traceable to the wrong." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 519 (Ind. 1993). By contrast, the measure of damages for breach of contract is either the damages arising naturally from the breach of contract itself or the damages that were reasonably within the contemplation of the parties at the time they entered the contract. *Indiana & Michigan Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588, 601 (Ind. App. 1987). This analysis turns on what the parties reasonably expected, not what might conceivably occur. *Id*. The parties did not brief this issue, and I have no idea what the parties reasonably expected at the time they entered the contract. So I am unwilling to make this determination at this time. Therefore, CoMentis has alleged enough to survive dismissal on this issue.

### 3.     CoMentis Fails to Plead Fraud with Particularity

Ghosh's final attack on Count Seven is the one issue raised in almost any fraud case: whether the plaintiff has plead fraud with particularity under Fed. R. Civ. P. 9(b). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Seventh Circuit has held that a party must "particularize" the fraud claim by alleging the "who, what, when, where, and how" of the alleged fraud. *DeLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Rule 9(b) forces the plaintiff to conduct a thorough investigation of the defendant's actions to discourage accusations in complaints "simply to gain leverage for settlement or for other ulterior purposes." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); *see also Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

According to CoMentis, the complaint plead fraud with particularity by setting forth: who made the fraudulent statements (Ghosh), to whom they were made (Geoff Bilcer), what was stated (that Ghosh conducted independent work outside of the Consulting Agreement), and when (in or around February 2009). [DE 62 at 11.] Nonetheless, Ghosh claims these allegations fail to meet the "what," "when," "where," and "how" elements of the Rule 9(b) test.

First, Ghosh argues that CoMentis failed to plead the "what" because it does not identify the information that is the subject of the fraud: the "particular compounds and structures" CoMentis gave to Ghosh, which gave rise to the patent applications at issue. According to Ghosh, the patent applications are long and complex, and by failing to state what part of the patent applications amounted to fraud, Ghosh can't respond to the allegation. But CoMentis argues that it adequately alleged the "what" by identifying the fraudulent statement Ghosh made to CoMentis. CoMentis claims that the identity of the misappropriated information is irrelevant because Ghosh's representations did not refer to specific information in the patent applications. In fact, the actual trade secrets are relevant only to the falsity of Ghosh's representations, which

CoMentis is not required to plead.

I agree with CoMentis. CoMentis did not have to explain what compounds Ghosh relied on in committing the fraud because the alleged misrepresentation is "what" Ghosh told CoMentis in February 2009. According to the complaint, Ghosh told CoMentis he had been developing work similar but independent of his work under the Consulting Agreement. CoMentis now claims this was a lie. To prove that, it will have to show that Ghosh actually was using CoMentis's information in the patent applications at issue. But it need not plead that under Rule 9(b). *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992) (Rule 9(b) does not "require him to plead facts showing that the representation is indeed false."). At this point, it is enough that CoMentis plead what the misrepresentation was, which it does by alleging what Ghosh said to Bilcer in February 2009.

Next, Ghosh argues that CoMentis's claim that the fraud occurred "[i]n or about February 2009" is not enough to plead the "when." But courts in this circuit have not required a specific date and time to meet this requirement. *See, e.g., Hefferman v. Bass*, 467 F.3d 596, 601-02 (7th Cir. 2006) (finding "some time in late August or early September 2003 late at night – it was after midnight" sufficient under Rule 9(b)) (internal quotations omitted); *Greer v. Advanced Equities, Inc.*, 683 F. Supp. 2d 761, 772 (N.D. Ill. 2010) ("The 'fall of 1999' or 'November 1999' . . . is specific enough under Rule 9(b).") (internal citations omitted). So CoMentis has sufficiently plead when the fraud took place for Rule 9(b) purposes.

Finally, Ghosh notes that CoMentis did not even attempt to allege the "where" and "how" elements. But CoMentis claims that this information is unnecessary because Ghosh would gain nothing by learning where Ghosh made the fraudulent statement and how he

communicated the misrepresentations to CoMentis. It notes that this rule requires flexibility and argues that the court should look to the substance of the allegations and determine whether the literal requirements of Rule 9(b) are met rather than rely on rigid application of the "who, what, when, where, and how" standard.

I disagree – under these circumstances, CoMentis should have alleged the "where" and "how" of the fraud. While the rules do require flexibility, the Seventh Circuit has been clear that in fraud cases the complaint generally must state the "place . . . and the method by which the misrepresentation was communicated to the plaintiff." *Old Republic*, 959 F.3d at 683; *see Windy City Metal fabricators & Supply, Inc. v. CIT*, 536 F.3d 663, 669 (7th Cir. 2008). But more importantly, the presence of both where and how the fraud occurred would further substantiate CoMentis's claim that Ghosh affirmatively lied about the independence of his work. Fraud allegations "can do serious damage to the goodwill of a business firm or a professional person," and so people should be discouraged from "tossing such accusations into complaints" for ulterior purposes. *Old Republic*, 959 F.2d at 983; *see Pirelli Armstrong Tire Corp. v. Walgreen Co.*, --- F.3d ---, 2011 WL 183163, at *4 (7th Cir. 2011) (noting the importance of substantiating a fraud claim). Here, additional particularity will help ensure that CoMentis is not alleging fraud because it's upset that its long-standing consulting deal with Ghosh went bad.

Moreover, while there are situations in which the Rule 9(b) requirements are relaxed, for example, when details are within the exclusive knowledge of the accused, *see Ackerman v. Nw. Mut. Life Ins.*, 172 F.3d 467, 471 (7th Cir. 1999), that is not the case here. In fact, the opposite is true – if Ghosh lied to a CoMentis employee, and CoMentis "conducted an extensive investigation before asserting [the] fraud" as it claims [DE 62 at 13 n.7], it should easily be able

to determine the place and method by which the misrepresentation occurred. *See Ackerman*, 172 F.3d at 469 (Rule 9(b) "force[s] the plaintiff to do more than the usual investigation before filing his complaint"). Instead, CoMentis merely alleges that Ghosh made a particular misrepresentation to a particular CoMentis employee around February 2009. Under these circumstances, Rule 9(b) requires more. As a result, Count Seven is dismissed, though I will give CoMentis leave to replead.

## B.     Constructive Fraud (Count Eight)

Ghosh also seeks to dismiss CoMentis's constructive fraud claim in Count Eight. Constructive fraud is "premised on the understanding that there are situations which might not amount to actual fraud, but which are so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent." *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 323-24 (Ind. App. 1991). The elements of constructive fraud are: 1) a duty owed to the plaintiff by the defendant arising from their relationship; 2) a violation of that duty by misrepresentation or by silence when a duty to speak exists; 3) reliance by the plaintiff; 4) injury proximately caused by that reliance; and 5) the defendant's gaining of an advantage at the plaintiff's expense. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). The plaintiff has the burden of proving both the existence of a duty owed to it stemming from their relationship and the gaining of an unconscionable advantage by the defendant at the expense of the plaintiff. *Heaton & Eadie Prof. Servs. Corp. v. Corneal Consultants of Indiana, P.C.*, 841 N.E.2d 1181, 1189 (Ind. App. 2006); *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. App. 2002).

The duty element may arise through a confidential or fiduciary relationship. *Morfin v. Martinez,* 831 N.E.2d 791, 802 (Ind. App. 2005). "A confidential or fiduciary relationship exists

when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 914 (Ind. App. 1999); *Heaton*, 841 N.E.2d at 1189. Nonetheless, "parties may not rely on a contractual relationship to create a duty that, if breached, would form the basis of a constructive fraud claim." *Allison v. Union Hospital, Inc.*, 883 N.E.2d 113, 123 (Ind. App. 2008). Indeed, "[a] fiduciary relationship may not be premised on an arms length transaction resulting in the formation of a contract." *American United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 701 (Ind. App. 2004).

Here, any duty that Ghosh owed to CoMentis arose from the parties' arms length agreement, not through a confidential or fiduciary relationship. That Ghosh co-founded the company that was the *predecessor to CoMentis*, does not change the fact that his long-standing relationship *with CoMentis* has been purely contractual. *See American Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 247 (Ind. App. 2010) (previous business transactions do not give rise to fiduciary obligations); *Comfax Corp. v. North Am. Van Lines, Inc.*, 587 N.E.2d 118, 126 (Ind. App. 1992) ("[P]ure contractual relations between parties entering into an arm's length transaction may not form the basis for constructive fraud."). And the existence of a confidentiality provision in the parties' contract does not make the entire relationship confidential. *Allison*, 883 N.E.2d at 123 n.6. As such, no confidential or fiduciary relationship exists.

The duty element may also be established through a buyer/seller relationship. *Morfin*, 831 N.E.2d at 802. To create a such a duty, the seller must "induce another to make a purchase, the buyer relies on those statements, and the seller has professed knowledge of the truth of the statements." *Yeager v. McManama*, 874 N.E.2d 629, 642 (Ind. App. 2007). In such a case, the

seller must "be in the unique possession of knowledge not possessed by the [buyer] and may thereby enjoy a position of superiority over the [buyer]," creating a duty of good faith and fair dealing. *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. App. 1994). Indiana courts have applied this rule outside of the traditional buyer/seller relationship. *See Wells v. Stone City Bank*, 691 N.E.2d 1246, 1251 (Ind. App. 1998) (applying buyer/seller rule to bank and checking account holder).

CoMentis argues that its relationship with Ghosh is comparable to the buyer/seller relationship because it purchased (1) Ghosh's consulting services, (2) the rights to Ghosh's work, and (3) Ghosh's assistance in perfecting its rights. And CoMentis claims that Ghosh violated his duty as a seller of services by inducing CoMentis to continue the consulting arrangement and negotiate a new license agreement through his misrepresentations. Moreover, because CoMentis had no way of knowing the truth of Ghosh's representations, CoMentis argues that Ghosh was in a position of superiority creating a duty of good faith and fair dealing.

But under the buyer/seller paradigm, Ghosh must induce CoMentis to "make a purchase." *Yeager*, 874 N.E.2d at 642. The only "purchase" that Ghosh could have plausibly induced CoMentis to make through his misrepresentations is the purchase of a new license agreement. But CoMentis would have "purchased" that license from Purdue, not Ghosh. *See Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 WL 1258052, at *3-4 (S.D. Ind. Mar. 25, 2010) (constructive fraud claim dismissed because "[Plaintiff] fails to allege that it bought anything from [Defendant]"). Nonetheless, CoMentis never purchased a new license agreement from Purdue either. While CoMentis alleges that Purdue agreed to a new license agreement (the Binding LOI), neither party performed under the agreement – CoMentis never paid Purdue for

the rights to a new license agreement, and CoMentis certainly didn't purchase anything by negotiating with Purdue.

This leads to the fundamental reason why CoMentis's constructive fraud claim fails – the complaint fails to allege how Ghosh benefitted from the misrepresentation. As noted above, in addition to alleging that Ghosh owed it a duty because of their relationship, CoMentis must allege that Ghosh gained an unconscionable advantage at CoMentis's expense. *Heaton*, 841 N.E.2d at 1189. This is the difference between actual fraud and contractive fraud – in lieu of fraudulent intent, a plaintiff alleging constructive fraud must show that the defendant secured an unconscionable advantage as a result of the parties' relationship and the defendant's misrepresentations. *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 628 (Ind. App. 1983). As such, the party charged with constructive fraud must "derive[] a benefit as a result" of his actions. *Strong*, 777 N.E.2d at 1149; *Porter County Dev. Corp. v. Citibank (South Dakota), N.A.*, 855 N.E.2d 306, 311 (Ind. App. 2006) (plaintiff must show "the gaining of an advantage by the party to be charged with fraud"); *Clarkson v. Whitaker*, 657 N.E.2d 139, 144 (Ind. App. 1995) ("The law presumes fraud when a person with a fiduciary duty benefits from a questioned transaction.").

Here, CoMentis fails to allege that Ghosh gained an unconscionable advantage at CoMentis's expense. CoMentis asserts that Ghosh induced it to enter negotiations for a new license agreement by representing that his work on certain patent applications was independent of his work for CoMentis. As a result, CoMentis claims that "Dr. Ghosh has gained an advantage at the expense of CoMentis." [DE 48 ¶ 80.] But CoMentis fails to allege *how Ghosh* benefitted from this deceit. Purdue owns the rights to Ghosh's work and Ghosh is not a party to

either the original License Agreement or the new license agreement negotiated by CoMentis and Purdue. And while it's possible that Ghosh may gain some advantage by helping his employer secure a more favorable license agreement, CoMentis has failed to allege any facts that plausibly suggest that's the case. CoMentis's "threadbare recital[] of the elements . . . supported by mere conclusory statements" will not do. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1949).

What's more, the parties never performed under the new license agreement, so how Ghosh gained an unconscionable advantage by inducing CoMentis to *negotiate* a new license agreement *with Purdue* is anybody's guess. While arguably Ghosh may derive some benefit if the patent applications are licensed to a third party on more favorable terms (though that too is unclear since, again, Purdue owns the rights to Ghosh's work), CoMentis does not allege that either. Finally, Ghosh did not gain an unconscionable advantage by "continuing the consulting arrangement" with CoMentis [DE 62 at 23-24], because telling the truth would have had the same effect. As a result, because it failed to plausibly allege that Ghosh secured an advantage at its expense, CoMentis's constructive fraud claim is dismissed, though again, I will give it leave to attempt to cure these defects.

## CONCLUSION

Accordingly, Purdue Research Foundation's Motion for Judgment on the Pleadings is **GRANTED** in part and **DENIED** in part. [DE 50.] Purdue's motion is **GRANTED** with respect to Count Nine and **DENIED** with respect to Counts Four, Five, Six, and Ten. Because the allegations in the Second Amended Complaint preclude recovery under an unjust enrichment theory, Count Nine is **DISMISSED** with prejudice.

Arun Ghosh's Motion to Dismiss, or in the Alternative, Motion for a More Definite Statement is **GRANTED**.  [DE 53.]  Counts Seven and Eight are **DISMISSED** without prejudice.  CoMentis may file an amended complaint curing the issues raised by this Opinion and Order with respect to Counts Seven and Eight by February 25, 2011.

**SO ORDERED**.

ENTERED: January 25, 2011.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT